IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| URETEK USA, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:18-cv-4432 |
| | § | |
| EAGLELIFT, INC. | § | **Demand for Jury Trial** |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF URETEK'S ORIGINAL COMPLAINT

Plaintiff URETEK USA, Inc. ("Uretek") pioneered the use of polyurethane to stabilize soils and lift structures through the development and commercialization of proprietary technologies protected by various forms of intellectual property.  Uretek had exclusively licensed the technology to StarLift Services, Inc. ("StarLift") for industrial, commercial, and residential ("ICR") uses but has since acquired StarLift.  Uretek contracted with distributors throughout the United States to commercialize the technology and provided them training, trade secrets, expertise, marketing materials, and trademark and license rights in exclusive territories.  To protect Uretek's investment, these distributors agreed to purchase polyurethane material only from Uretek and not compete with Uretek during or for four years after their contract.

EagleLIFT, Inc. ("EagleLIFT") became a sales representative for Uretek in 1999 and a distributor in 2004.  Uretek discovered in 2017 that EagleLIFT had purchased and used polyurethane material from a third party.  Uretek notified EagleLIFT that this was a breach of

contract and the agreements between the parties were terminated in early 2018.  Shortly after termination, EagleLIFT began competing with Uretek in the polyurethane injection industry and continues competing with Uretek today. In such competition, EagleLIFT has commercially used Uretek trademarks and copyrightable works and made false and misleading representations, which have confused Uretek's customers and potential customers.  Therefore, for its original complaint for breach of contract, trademark infringement, false advertising under § 43(a) of the Lanham Act, and misappropriation under Texas law, Uretek alleges as follows:

## THE PARTIES

1.      Plaintiff Uretek is an Iowa company that maintains a principal place of business at 13900 Humble Road, Tomball, TX 77375.

2.      On information and belief, Defendant EagleLIFT is a corporation organized under the laws of California with a principal place of business at 3175 Sedona Ct., Suite D, Ontario, CA 91764.

## JURISDICTION & VENUE

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1338(a) and (b) as Uretek's claims for trademark infringement and false advertising (as joined to the claims of trademark infringement) arise under the laws of the United States.  The Court has supplemental jurisdiction over Uretek's remaining claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy with the claims for which this Court has original jurisdiction.

4.      This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the jurisdictional amount and is between citizens of different states.

5.     This Court has personal jurisdiction over Uretek as Uretek has a principal place of business in the State of Texas and consents to such jurisdiction.

6.     This Court has personal jurisdiction over EagleLIFT pursuant to contractual agreement of Uretek and EagleLIFT.

7.     Uretek and EagleLIFT entered into a Sales Representative Agreement on January 11, 1999, and amended on September 11, 2015 ("Sales Representative Agreement"), which provides the following:

> The validity, effect, and interpretation of this contract shall be governed by the laws of the State of Texas, and the appropriate trial court of the State of Texas shall have jurisdiction over any dispute which arises under this contract, and each of the parties shall submit to, and hereby consents to, such court's exercise of jurisdiction.

Uretek and EagleLIFT also entered into a Sublicense and Distributorship Agreement on September 29, 2004, which was renewed for 10 additional years on July 28, 2014 ("Distributorship Agreement"), and includes similar language.[1] This Complaint arises under both of these contracts.

8.     Accordingly, EagleLIFT is subject to the personal jurisdiction of a trial court of the State of Texas.

9.     As Uretek is serving a summons on EagleLIFT concurrent with the filing of this Complaint, such summons establishes that this Court also has personal jurisdiction over EagleLIFT pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure because EagleLIFT is subject to the jurisdiction of a court of general jurisdiction in Texas—a trial court—where the United States District Court for the Southern District of Texas is located.

10.     This Court is also the proper venue for this matter.

---

[1] The Distributorship Agreement includes an arbitration provision, but the matters asserted in this Complaint arising under the Distributorship Agreement are specifically exempted from such arbitration provision at least because Uretek is seeking an injunctive order from this Court.

11.     The Distributorship Agreement entered into between Uretek and EagleLIFT provides that "[v]enue for all disputes . . . shall be in Texas."  This complaint arises under the Distributorship Agreement.

12.     Accordingly, this Court is the proper venue for this matter.

13.     This Court is also the proper venue for this matter pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Uretek's breach of contract claims, including the negotiation and execution of such contracts, occurred in this district.

14.     Alternatively, this Court is the proper venue for this matter pursuant to 28 U.S.C. § 1391(b)(3) because EagleLIFT is subject to this Court's personal jurisdiction, as explained above.

## FACTUAL BACKGROUND

### A.     Plaintiff Uretek

15.     Uretek is a Tomball-based engineering and construction company focused primarily on concrete and asphalt lifting and stabilization, void-filling, soil compaction and stabilization, and infrastructure rehabilitation services using injected polyurethane grouts (collectively, "Polyurethane Injection Services").

16.     Beginning in 1989, Uretek commercialized and developed a patented technology known as "The Uretek Method" for lifting and stabilizing concrete structures by injecting polyurethane foam into the soil beneath such structures.

17.     In the late 1990s, Uretek commercialized and developed a patented improvement to The Uretek Method known as the Deep Injection process.

18.     During and since that time, Uretek has commercialized and developed the use of two-component polymers for use in Polyurethane Injection Services, including The Uretek Method and

the Deep Injection process, and owns patents and trade secrets related to the use and formulations of such polymers.

19.     Since 1989, Uretek has been active in developing and commercializing additional technologies related to the Polyurethane Injection Services and licensing and training others to perform Polyurethane Injection Services.

**B.      Defendant EagleLIFT**

20.     Upon information and belief, EagleLIFT is a California-based construction company focused primarily on foundation repair, sewer repair, and soil stabilization and void filling services, including the performance of Polyurethane Injection Services.

**C.      EagleLIFT became a sales representative and distributor of Uretek**

*Sales Representative Agreement*

21.     Uretek and EagleLIFT entered into a Sales Representative Agreement almost 20 years ago, whereby Uretek authorized EagleLIFT to sell Polyurethane Injection Services in Arizona and California and Uretek agreed to pay EagleLIFT commissions for such sales.

22.     While EagleLIFT marketed Polyurethane Injection Services, Uretek actually provided the services, except on rare occasions when Uretek permitted EagleLIFT to perform such work.

23.     As part of the Sales Representative Agreement, Uretek provided EagleLIFT confidential information, including trade secrets, relating to the Polyurethane Injection Services.

24.     As part of the Sales Representative Agreement, EagleLIFT agreed to not perform any "conflicting service" in the United States during the term of the Sales Representative Agreement and for four years after its termination.

25.    "Conflicting service" is defined in the Sales Representative Agreement as follows:

> **(d)   "Conflicting Service"** as used herein shall mean selling, promoting, distributing, assisting, consulting or otherwise furthering the sale, promotion or distribution of any product or service which competes with URETEK USA's business.

26.    "URETEK USA's business" is defined in the recitals to the Sales Representative Agreement to include "[t]he lifting, realigning, void filling, undersealing, base and sub-base replacement processes using polyurethane or any other expandable polymer as generally outlined in U.S. Patent # 4,567,708," and "[t]hose proprietary and trade secret technologies and methods developed by URETEK, its employees, sales representatives, officers or board members to generally advance and improve the implementation of" that process.

27.    EagleLIFT also agreed not to use Uretek's confidential information or trade secrets to compete with Uretek for four years after termination of the Sales Representative Agreement.

28.    EagleLIFT agreed that its use of Uretek's trade secrets, confidential information, and research and general business strategy to perform conflicting services after termination of the Sales Representative Agreement would materially injure Uretek.

29.    EagleLIFT agreed that the scope of the non-competition provisions were reasonable and necessary to protect Uretek's interest and its intellectual property, including trade secrets.

30.    EagleLIFT agreed that Uretek would be entitled to injunctive relief as a matter of right for any breach of non-compete provisions of the Sales Representative Agreement.

31.    Also as part of the Sales Representative Agreement, EagleLIFT assigned and agreed to assign to Uretek all intellectual property, including inventions and copyrightable works, "related in any way whatsoever to the products, services, or general business of URETEK USA" that EagleLIFT made during the term of the Sales Representative Agreement, and agreed that such copyrightable works were "works for hire" as that term is used in 17 U.S.C. § 101.

32.     EagleLIFT agreed that upon termination of the Sales Representative Agreement, it would "permanently delete and purge any electronic file in [its] possession or control . . . which contains, relates to, or is a derivative of the Intellectual Property."

33.     EagleLIFT agreed that Uretek would be entitled to recover attorneys' fees and expenses in any successful action to enforce the Sales Representative Agreement.

34.     EagleLIFT represented that it had the opportunity to consult legal counsel before signing the Sales Representative Agreement.

35.     The Sales Representative Agreement automatically renewed each year unless one of the parties opted out.

36.     The Sales Representative Agreement was amended in 2015 to formally add Nevada to EagleLIFT's territory and to limit the field of use of EagleLIFT's representation to government projects, such as Department of Transportation ("DOT") work, and other non-ICR applications.

        *Distributorship Agreement*

37.     About 6 years after entering into the Sales Representative Agreement, Uretek and EagleLIFT entered into the Distributorship Agreement, whereby EagleLIFT became an exclusive sublicensee and distributor of Uretek's Polyurethane Injection Services in Arizona, California, and Nevada for ICR applications only.

38.     Uretek agreed not to compete with EagleLIFT in Arizona, California, and Nevada for ICR work or to license others to compete with EagleLIFT in these territories for ICR work.

39.     As part of EagleLIFT's appointment, Uretek provided EagleLIFT confidential information, trade secrets, know-how, and training relating to proprietary polyurethane injection techniques, the rights and equipment to perform such techniques, and the rights to use Uretek's trademarks and marketing materials.

Case 4:18-cv-04432   Document 1   Filed in TXSD on 11/21/18   Page 8 of 35

40.     The nature of the confidential information and trade secrets was explained in the Distributorship Agreement as follows:

> The technology rights, including trade secret, confidential and know-how information are described in **Exhibit B. Exhibit B** refers to a series of documents that contains trade secret, confidential and know-how information related to: (1) chemical component information and detail; (2) URETEK Deep Injection techniques, know-how, tools and equipment; (3) a unique drilling and injection technique; (4) timed injection sequence techniques for various URETEK PROCESSES, (5) an injection-gun modification for simplifying certain URETEK PROCESSES, (6) a system for attaching the gun to an injector, and (7) various other items. The above confidential information is subject to a confidential disclosure agreement (**Exhibit D**). Upon execution of this Agreement, the present **Exhibit B** will be replaced with an **Exhibit B** containing, under seal, the full text of the confidential information.

41.     EagleLIFT agreed to purchase polyurethane material for the performance of any "URETEK PROCESSES" only from Uretek.

42.     The URETEK PROCESSES are defined in the Distributorship Agreement as follows:

> A.     The URETEK PROCESSES are defined as an integrated, single system for the rehabilitation of concrete and include the intellectual property of URETEK. The URETEK PROCESSES consist of patents, patent applications and technical rights that include trade secret, confidential and know-how information. The patent and patent applications are described in the attached **Exhibit A** and consist of issued patents and patent applications owned by or licensed to URETEK, including any divisionals, continuations, and continuations-in-part thereon, or any reissues or extensions thereof, all being hereafter collectively referred to as "patents" whenever that term is used herein. The processes, materials and methods described in **Exhibit A** are utilized in the analysis, repair, and rehabilitation of concrete slabs and other pavements of various compositions including, but not limited to, the lifting, void-filling, and under-sealing of concrete slabs and pavements.

43.     EagleLIFT agreed that it would be liable for liquidated damages if it failed to purchase polyurethane material for any URETEK PROCESSES only from Uretek as follows:

> 2.     <u>Prohibited Purchase of 486 STAR and URETEK 684 from Others</u>
> Should SUBLICENSEE/DISTRIBUTOR fail to purchase 486 STAR and/or URETEK 684 from STARLIFT, regardless of the reason for such failure, then this Agreement shall be terminated and, in addition, as liquidated damages for such breach and, in lieu of the lost economic benefit that STARLIFT would normally realize from its sale of 486 STAR and/or URETEK 684, SUBLICENSEE/DISTRIBUTOR agrees to pay a royalty directly to STARLIFT, no later than fifteen days from notification by STARLIFT of such demand for liquidated damages and notice of termination, an amount equal to 50% of its gross revenues collected from customers serviced by materials not supplied by STARLIFT.

44.     EagleLIFT also agreed not perform any "conflicting service" in the United States during the term of the Distributorship Agreement and for four years after its termination.

45.     "Conflicting service" is defined as follows:

> (g)     **"Conflicting Service"** as used herein shall mean selling, promoting, distributing, assisting, consulting or otherwise furthering the sale, promotion or distribution of any product or service which competes with URETEK's business and which has not been licensed or authorized by URETEK.

46.     "URETEK's business" is defined as follows:

> (b)     **"URETEK business"** shall mean providing and distributing services using the URETEK PROCESSES and URETEK PRODUCTS in the field of buildings and transportation related projects for public works clients, and transportation related projects for clients such as federal, state, local governments and subdivisions thereof, as well as independently-created public corporations such as toll road authorities, port authorities, subway authorities and aqueduct authorities, and for projects related to the repair and rehabilitation of earth-supported concrete slabs, freeways, highways, roads, streets, bridges, depots, airfield landing and taxiway areas, or publicly owned (or long-term leased) parking areas, ramps, tollways, and public airports, railroads, tunnels, and subways.

47.     EagleLIFT also agreed not to use Uretek's confidential information or trade secrets to compete with Uretek for four years after termination of the Distributorship Agreement.

48.     EagleLIFT agreed that use of Uretek's trade secrets, confidential information, and research and general business strategy to perform conflicting service after termination of the Distributorship Agreement would materially injure Uretek.

49.     EagleLIFT agreed that the scope of the non-competition provisions were reasonable and necessary to protect Uretek's interest and its intellectual property, including trade secrets.

50.     EagleLIFT agreed that Uretek would be entitled to injunctive relief as a matter of right for any breach of non-compete provisions of the Distributorship Agreement.

51.     EagleLIFT agreed that the scope of the non-competition provisions were reasonable and necessary to protect Uretek's interest and its intellectual property, including trade secrets.

52.     EagleLIFT also assigned and agreed to assign to Uretek all intellectual property, including inventions and copyrightable works, related to the URETEK PROCESSES that it made during the term of the Distributorship Agreement.

53.     EagleLIFT agreed that within sixty days of termination of the Distributorship Agreement, it would "permanently delete and purge any electronic file in [its] possession or control which contains, relates to, or is a derivative of Uretek's Intellectual Property."

54.     EagleLIFT agreed that Uretek would be entitled to recover attorneys' fees and expenses in any successful action to enforce the Distributorship Agreement.

55.     EagleLIFT represented that it and its counsel reviewed the Distributorship Agreement before it signed the Distributorship Agreement.

56.     The Distributorship Agreement had a ten year term that could be renewed for an additional ten years at the option of EagleLIFT.  EagleLIFT exercised that option in 2014.

### D.     The agreements were terminated following EagleLIFT's breach

57.     Uretek learned in 2017 that EagleLIFT had purchased polyurethane material from a third party and used that material to perform an ICR application.

58.     Uretek informed EagleLIFT that such conduct breached the Distributorship Agreement and demanded EagleLIFT pay it the amount of revenue it would have received had EagleLIFT purchased the material from it, as it was required to by contract.

59.     Upon information and belief, EagleLIFT, at other times during the term of the Distributorship Agreement, purchased polyurethane material from third parties and used that material to perform URETEK PROCESSES in contravention of the parties' agreements.

60.     The Sales Representative Agreement and Distributorship Agreement were terminated in February and March of 2018, respectively.

61.     Around the time of termination, Uretek reminded EagleLIFT of its continuing obligations under the agreements, including its requirements to not perform conflicting service for four years and to cease using all Uretek trademarks and trade names.

### E.    EagleLIFT competes unfairly with Uretek

62.    In May of 2018, Uretek learned that EagleLIFT had bid and won a job from the California Department of Transportation.  Upon information and belief, EagleLIFT has or will use Uretek confidential information and trade secrets to perform this job.

63.    In June of 2018, Uretek learned that EagleLIFT had bid and won a job from the Port of Seattle in the State of Washington that required EagleLIFT to perform Polyurethane Injection Services.  The value of this job increased in September of 2018.

64.    Upon information and belief, EagleLIFT has or will use Uretek confidential information and trade secrets to perform the Port of Seattle job.

65.    Upon information and belief, since termination of the Sales Representative Agreement and Distributorship Agreement, EagleLIFT has also bid on and received other contracts to perform Polyurethane Injection Services in competition with Uretek in Arizona, Nevada, and outside EagleLIFT's territory (as defined in the Sales Representative Agreement and Distributorship Agreement).

66.    Upon information and belief, EagleLIFT has or will use Uretek confidential information and trade secrets to perform these other contracts.

*EagleLIFT's use of Uretek trademarks, trade names, and copyrightable works in commerce*

67.    EagleLIFT is still using Uretek's copyrightable works, such as its videos and pictures, as well as its trademarks and trade names, including "Uretek" and "Deep Injection," in its advertising, as shown in the below examples from EagleLIFT's website and Facebook page.



*See* "URETEK Industrial Commercial Interior & Exterior" video, Services, EAGLELIFT, *available at* http://eaglelifting.com/ and http://eaglelifting.com/arizona-foundation-repair/#1466107083842-4da63656-3cf489ae-3571 and http://eaglelifting.com/california-foundation-repair/ and http://eaglelifting.com/nevada-foundation-repair/ (last visited Nov. 12, 2018).



*See* "EagleLIFT AZ Marriott" video at 0:49-0:58, Projects, EAGLELIFT, *available at* http://eaglelifting.com/project/marriott-ramp-approach-slab-lift/ (last visited Nov. 12, 2018).



*See* "Addicks and Barker Outfall and Spillway Repair.," Latest news, EAGLELIFT, *available at*

http://eaglelifting.com/news/page/2/ (last visited Nov. 12, 2018).



*See* "Information Video #1: URETEK® Deep Injection" video, All Videos, FACEBOOK,

*available at* https://www.facebook.com/eagleliftinc/videos/ (last visited Nov. 13, 2018).



*See* "EagleLIFT Foundation Lift" video, All Videos, FACEBOOK, *available at* https://www.facebook.com/eagleliftinc/videos/ (last visited Nov. 13, 2018).



*See* "Zero: Excavation: URETEK Infrastructure Rehabilitation" video, Services, EAGLELIFT, *available at* http://eaglelifting.com/ (last visited Nov. 12, 2018).

14



*See* "Union Pacific Railway Repair" video at 1:35-1:40, Railroad Ballast Repair and Stabilization, EAGLELIFT, *available at* http://eaglelifting.com/our-services/railroad-ballast-repair/ (last visited Nov. 12, 2018).

68.     In September 2018, Uretek learned from multiple customers that EagleLIFT had provided them presentations that included images of Uretek-branded trucks.   The customers contacted Uretek because they were confused about the relationship between Uretek and EagleLIFT.

<u>*EagleLIFT's false and misleading statements and representations of fact*</u>

69.     EagleLIFT falsely states on its website that it is the "sole licensee in Arizona, California, and Nevada" of Uretek and of the "URETEK Polymer Injection Process."   *See* "Sewer and Foundation Repair Technologies," EAGLELIFT, *available at* http://eaglelifting.com/technologies/ (last visited Nov. 12, 2018);   "EagleLIFT is featured in ADOT Loop 101 Road Lift Project Video," LATEST NEWS EAGLELIFT, *available at* http://eaglelifting.com/news/page/3/ (last visited Nov. 12, 2018).

70.    Although EagleLIFT has rarely performed Polyurethane Injection Services for government entities, such as state DOTs—as such work was performed primarily by Uretek—it advertises on its website that it has 15-20 years of experience performing such work.

## Roadway Lifting and Stabilization

EagleLIFT has provided roadway lifting and stabilization services for municipalities and DOT departments in California, Nevada and Arizona for 20 years

**VIEW SERVICE DETAIL**

*See* OUR SERVICES, EAGLELIFT, *available at* http://eaglelifting.com/our-services/ (last visited Nov. 12, 2018).

# ROADWAY LIFTING AND LEVELING



EagleLIFT has provided roadway lifting and stabilization services for municipalities and Department of Transportation ( DOT ) departments in California, Nevada and Arizona for the last 15 years.  We approach roadway repair through a unique approach for soil compaction and stabilization.

*See* ROADWAY LIFTING AND STABILIZATION, EAGLELIFT, *available at* http://eaglelifting.com/our-services/roadway-lifting/ (last visited Nov. 12, 2018).

71.     Upon information and belief, EagleLIFT holds itself out as having performed a $2 million project for the California Department of Transportation in the San Francisco Bay area in 2017 that was actually completed by Uretek.

72.     In May of 2018, the city of Laguna Niguel failed to request bids for a project requiring Polyurethane Injection Services because it was under the false impression that "EagleLIFT is the only company that provides this service in Southern California," despite it being Uretek crews that primarily performed the work in this area for the prior 19 years.

73.     Although EagleLIFT did not help Uretek develop the Polyurethane Injection Services nor contribute to any patented injection method or polymer, it states on its website that it has helped innovate such services and refers to Uretek's injection techniques as "EagleLIFT's proprietary injection designs" that "evolved the industry."

## EagleLIFT Inc, announces its Proprietary "EL" Polymers in Collaboration with NCFI Polyurethanes

POSTED BY ADMIN ON SEPTEMBER 13, 2018 WITH 0 COMMENT

**Ontario, CA** – EagleLIFT Inc., a foundation repair and soil rehabilitation contractor based in Ontario, CA, announced the release of its proprietary "EL" polymers that it says will change the industry.

With over 20 years of operational and design expertise, EagleLIFT has helped innovate the use of two-part chemical grout as a soil compaction and foundation lifting solution. EagleLIFT's proprietary injection designs have evolved the industry by providing new techniques for achieving soil bearing capacity improvements.



See "EagleLIFT Inc, announces its Proprietary 'EL' Polymers in Collaboration with NCFI Polyurethanes," LATEST NEWS EAGLELIFT, *available at* http://eaglelifting.com/2018/09/13/eaglelift-inc-announces-proprietary-el-polymers-collaboration-ncfi-polyurethanes/ (last visited Nov. 12, 2018).

We have helped innovate Chemical Grout Deep Injection for road leveling for a variety of pavement types, including both flexible pavement and rigid pavement. We do this by densifying and compacting the base and subgrade support soils by injecting a high density, water resistant expansive structural polymer.

*See* ROADWAY LIFTING AND STABILIZATION, EAGLELIFT, *available at* http://eaglelifting.com/our-services/roadway-lifting/ (last visited Nov. 12, 2018).

74.     Upon information and belief, EagleLIFT holds itself out as having developed the two-part polymers that are used in the Polymer Injection Services.

## **FIRST CLAIM FOR RELIEF: Breach of Contract**

### *COUNT 1: SALES REPRESENTATIVE AGREEMENT ARTICLE 9 OF EXHIBIT B*

75.     Uretek incorporates by reference all previous factual statements and allegations.

76.     EagleLIFT signed the Sales Representative Agreement with Uretek that required EagleLIFT to not perform conflicting services anywhere in the United States for four years after termination of the Sales Representative Agreement, and to not use Uretek's confidential information or trade secrets to compete with Uretek anywhere in the United States for four years after termination of the Sales Representative Agreement.

77.     EagleLIFT signed the Sales Representative Agreement where it agreed that the non-compete provisions were reasonable and necessary to protect Uretek's interests and intellectual property, including trade secrets.

78.     The non-compete provisions of the Sales Representative Agreement are reasonable and necessary to protect Uretek's interest and intellectual property, including its trade secrets.

79.     EagleLIFT breached the Sales Representative Agreement by performing conflicting services in Washington, Nevada, Arizona, and outside its territory (as defined in the Sales

18

Representative Agreement) within four years of termination of the Sales Representative Agreement.

80.     Upon information and belief, EagleLIFT continues to breach the Sales Representative Agreement by performing conflicting services in Nevada, Arizona, and outside its territory (as defined in the Sales Representative Agreement) after termination of the Sales Representative Agreement.

81.     Upon information and belief, EagleLIFT breached the Sales Representative Agreement by using Uretek's confidential information and trade secrets to compete with Uretek in the United States within four years after termination of the Sales Representative Agreement.

82.     Upon information and belief, EagleLIFT continues to breach the Sales Representative Agreement by using Uretek's confidential information and trade secrets to compete with Uretek in the United States.

83.     EagleLIFT's past and continuing breaches of the Sales Representative Agreement were and are willful at least because EagleLIFT knew of its continuing obligations under the Sales Representative Agreement and was informed of such obligations at the time the Sales Representative Agreement was terminated and after termination.

84.     Uretek has performed all of its conditions, covenants, and promises under the Sales Representative Agreement.

85.     As a proximate result of EagleLIFT's breach of the Distributorship Agreement, Uretek has been and will be further damaged, and EagleLIFT has been unjustly enriched, in an amount subject to proof at trial.

### *COUNT 2: SALES REPRESENTATIVE AGREEMENT ARTICLE 11 OF EXHIBIT B*

86.    Uretek incorporates by reference all previous factual statements and allegations.

87.    EagleLIFT signed the Sales Representative Agreement with Uretek that required EagleLIFT, upon termination of the Sales Representative Agreement, to permanently delete and purge any electronic file in [its] possession or control . . . which contains, relates to, or is a derivative of the Intellectual Property."

88.    EageLIFT also signed the Sales Representative Agreement, whereby it assigned to Uretek all its "right, title, and interest in and to all Intellectual Property" it authored or made during the term of the Sales Representative Agreement that relates in any way whatsoever to the products, services, or general business of Uretek.

89.    EagleLIFT signed the Sales Representative Agreement, where it agreed that the term "Intellectual Property" would include copyrightable works which relate to Uretek's business, products, or services.

90.    Uretek is the author of the original works, including videos and pictures, it created during the term of the Sales Representative Agreement ("Uretek-Made Works"), which are fixed in tangible mediums of expression.

91.    Upon information and belief, EagleLIFT is the author of the original works, including videos, pictures and other content, it created during the term of the Sales Representative Agreement related to the products, services, or general business of Uretek ("EagleLIFT-Made Works"), which are fixed in tangible mediums of expression.

92.    EagleLIFT breached the Sales Representative Agreement by failing to "permanently delete and purge any electronic file in [its] possession or control . . . which contains, relates to, or is a derivative of the Intellectual Property," including the Uretek-Made Works and the EagleLIFT-

Made Works (collectively, "Uretek Works"), after termination of the Sales Representative Agreement.

93.     EagleLIFT's breaches of the Sales Representative Agreement are willful at least because EagleLIFT knew of its obligations under the Sales Representative Agreement and was informed of such obligations at the time the Sales Representative Agreement was terminated.

94.     Uretek has performed all of its conditions, covenants, and promises under the Sales Representative Agreement.

95.     As a proximate result of EagleLIFT's breach of the Sales Representative Agreement, Uretek has been and will be further damaged, and EagleLIFT has been and will be unjustly enriched, in an amount subject to proof at trial.

### COUNT 3: DISTRIBUTORSHIP AGREEMENT ARTICLE 9 OF EXHIBIT D

96.     Uretek incorporates by reference all previous factual statements and allegations.

97.     EagleLIFT signed the Distributorship Agreement with Uretek that required EagleLIFT to not perform conflicting services anywhere in the United States for four years after termination of the Distributorship Agreement, and not to use Uretek's confidential information or trade secrets to compete with Uretek anywhere in the United States for four years after termination of the Distributorship Agreement.

98.     EagleLIFT signed the Distributorship Agreement where it agreed that the non-compete provisions were reasonable and necessary to protect Uretek's interests and intellectual property, including trade secrets.

99.     The non-compete provisions of the Distributorship Agreement are reasonable and necessary to protect Uretek's interest and intellectual property, including its trade secrets.

100.    EagleLIFT breached the Distributorship Agreement by performing conflicting service in Washington, Nevada, Arizona, and outside EagleLIFT's territory (as defined in the Distributorship Agreement) within four years of termination of the Distributorship Agreement.

101.    Upon information and belief, EagleLIFT continues to breach the Distributorship Agreement by performing conflicting service in Nevada, Arizona, and outside EagleLIFT's territory (as defined in the Distributorship Agreement) after termination of the Distributorship Agreement.

102.    Upon information and belief, EagleLIFT breached the Distributorship Agreement by using Uretek's confidential information and trade secrets to compete with Uretek in the United States within four years of termination of the Distributorship Agreement.

103.    Upon information and belief, EagleLIFT continues to breach the Distributorship Agreement by using Uretek's confidential information and trade secrets to compete with Uretek in the United States after termination of the Distributorship Agreement.

104.    EagleLIFT's past and continuing breaches of the Distributorship Agreement were and are willful at least because EagleLIFT knew of its continuing obligations under the Distributorship Agreement and was informed of such obligations at the time the Distributorship Agreement was terminated and after termination.

105.    Uretek has performed all of its conditions, covenants, and promises under the Distributorship Agreement.

106.    As a proximate result of EagleLIFT's breach of the Distributorship Agreement, Uretek has been and will be further damaged, and EagleLIFT has been and will be unjustly enriched, in an amount subject to proof at trial.

### *COUNT 4: DISTRIBUTORSHIP AGREEMENT ARTICLE 16.C.1.(C)(2)*

107.    Uretek incorporates by reference all previous factual statements and allegations.

108.    EagleLIFT signed the Distributorship Agreement with Uretek that required EagleLIFT, within sixty days of termination of the Distributorship Agreement, to permanently delete and purge any electronic file in [its] possession or control which contains, relates to, or is a derivative of Uretek's Intellectual Property."

109.    EageLIFT also signed the Distributorship Agreement, whereby it assigned to Uretek all its "right, title, and interest in and to all Intellectual Property" it authored or made during the term of the Distributorship Agreement that relates in any way to the URETEK PROCESSES and the URETEK PRODUCTS (as defined in the Distributorship Agreement).

110.    EagleLIFT signed the Distributorship Agreement, where it agreed that the term "Intellectual Property" would include copyrightable works that relate to Uretek's business, products, or services, including the URETEK PROCESSES and URETEK PRODUCTS.

111.    Uretek is the author of the original works, including videos and pictures, it created during the term of the Distributorship Agreement ("Uretek-Made Works"), which are fixed in tangible mediums of expression.

112.    Upon information and belief, EagleLIFT is the author of the original works, including videos, pictures and other content, it created during the term of the Distributorship Agreement related to the products, services, or general business of Uretek, including the URETEK PROCESSES and URETEK PRODUCTS ("EagleLIFT-Made Works"), which are fixed in tangible mediums of expression.

113.    EagleLIFT breached the Sales Representative Agreement by failing to "permanently delete and purge any electronic file in [its] possession or control which contains, relates to, or is a

derivative of Uretek's Intellectual Property," including the Uretek-Made Works and the EagleLIFT-Made Works (collectively, "Uretek Works"), within sixty days of termination of the Distributorship Agreement.

114.    EagleLIFT's breaches of the Distributorship Agreement are willful at least because EagleLIFT knew of its obligations under the Distributorship Agreement and was informed of such obligations at the time the Distributorship Agreement was terminated.

115.    Uretek has performed all of its conditions, covenants, and promises under the Distributorship Agreement.

116.    As a proximate result of EagleLIFT's breach of the Distributorship Agreement, Uretek has been and will be further damaged, and EagleLIFT has been and will be unjustly enriched, in an amount subject to proof at trial.

### COUNT 5: DISTRIBUTORSHIP AGREEMENT ARTICLE 8.H.

117.    Uretek incorporates by reference all previous factual statements and allegations.

118.    EagleLIFT signed the Distributorship Agreement with Uretek that required EagleLIFT to purchase only from Uretek polyurethane material used for any of the URETEK PROCESSES.

119.    EagleLIFT breached the Distributorship Agreement by purchasing polyurethane material from parties other than Uretek and using the purchased material to perform URETEK PROCESSES without Uretek's consent.

120.    EagleLIFT's breaches of the Distributorship Agreement were willful at least because EagleLIFT knew of its obligations under the Distributorship Agreement and was reminded of such obligations by EagleLIFT.

121.    Uretek has performed all of its conditions, covenants, and promises under the Distributorship Agreement.

122.   As a proximate result of EagleLIFT's breach of the Distributorship Agreement, Uretek has been and will be further damaged, and EagleLIFT has been and will be unjustly enriched, in an amount subject to proof at trial.

### SECOND CLAIM FOR RELIEF: Trademark Infringement (15 U.S.C. § 1114)

123.   Uretek incorporates by reference all previous factual statements and allegations.

124.   Uretek properly registered the following trademarks with the United States Patent and Trademark Office under 15 U.S.C. § 1114 ("Uretek Trademarks"):

a)  URETEK word and design mark (Ser. No. 77666254; Reg. No. 3679168) in the field of "construction, repair, and structural rehabilitation services for roads, concrete slabs and concrete structures," as shown below.



b)  URETEK USA word and design mark (Ser. No. 77666107; Reg. No. 3751360) in the field of "construction, repair, and structural rehabilitation services for roads, concrete slabs and concrete structures," as shown below.



c)  URETEK word mark (Ser. No. 77666227; Reg. No. 3679167) in the field of "construction, repair, and structural rehabilitation services for roads, concrete slabs and concrete structures."

d)  URETEK USA word mark (Ser. No. 77666070; Reg. No. 3679165) in the field of "construction, repair, and structural rehabilitation services for roads, concrete slabs and concrete structures."

e)  THE URETEK METHOD word mark (Ser. No. 77666056; Reg. No. 3679164) in the field of "construction, repair, and structural rehabilitation services for roads, concrete slabs and concrete structures."

f)  DEEP INJECTION word mark (Ser. No. 77666122; Reg. No. 3783345) in the field of "construction, repair, and structural rehabilitation services for roads, concrete slabs and concrete structures."

g)  The design mark shown below (Ser. No. 75491685; Reg. No. 2251502) in the field of "Construction, Repair, and Rehabilitation Services for Roads and Concrete Slabs."



125.  Uretek owns the Uretek Trademarks and they are valid and subsisting. 15 U.S.C. § 1072.

126.  Uretek used the Uretek Trademarks in commerce in connection with the sale of services, including Polyurethane Injection Services.

127.  Uretek gave notice that the Uretek Trademarks were registered by displaying with the Uretek Trademarks, the letter R enclosed within a circle – "®".

128.  Upon information and belief, EagleLIFT had actual notice that some or all of the Uretek Trademarks were registered with the United States Patent and Trademark Office.

129.  EagleLIFT infringed the Uretek Trademarks in violation of 15 U.S.C. § 1114(a) by using, without Uretek's consent, a reproduction, counterfeit, copy, or colorable imitation of the Uretek Trademarks in connection with the sale, offering for sale, distribution, or advertising of goods or services, on or in connection with which such use has or is likely to cause confusion, or to cause mistake, or to deceive.

130.    Upon information and belief, EagleLIFT continues to infringe the Uretek Trademarks in violation of 15 U.S.C. § 1114(a) by using, without Uretek's consent, a reproduction, counterfeit, copy, or colorable imitation of the Uretek Trademarks in connection with the sale, offering for sale, distribution, or advertising of goods or services, on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

131.    The services offered and continuing to be offered in connection with EagleLIFT's infringement are and were identical to those offered and being offered by Uretek.

132.    The services offered and continuing to be offered in connection with EagleLIFT's infringement competed with and continue to compete with Uretek's business.

133.    As a proximate result of EagleLIFT's infringement of the Uretek Trademarks, Uretek has been and will be further damaged, and EagleLIFT has been and will be unjustly enriched, in an amount subject to proof at trial.

### THIRD CLAIM FOR RELIEF: False Advertising (15 U.S.C. § 1125(a))

#### COUNT 1: IMPROPER USE OF URETEK TRADEMARKS (15 U.S.C. § 1125(a)(1)(A))

134.    Uretek incorporates by reference all previous factual statements and allegations.

135.    EagleLIFT violated 15 U.S.C. § 1125(a)(1)(A) (section 43 of the Lanham Act) by using the Uretek Trademarks without Uretek's consent in connection with services, including Polyurethane Injection Services, in commerce, including on its website and on Facebook.

136.    Upon information and belief, EagleLIFT continues to violate 15 U.S.C. § 1125(a)(1)(A) (section 43 of the Lanham Act) by continuing to use the Uretek Trademarks without Uretek's consent in connection with services, including Polyurethane Injection Services, in commerce, including on its website and on Facebook.

137. EagleLIFT's prior and continuing use of the Uretek Trademarks has and is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of EagleLIFT with Uretek, or as to the origin, sponsorship, or approval of EagleLIFT's services, or commercial activities by Uretek.

138. As a proximate result of EagleLIFT's violations of § 1125(a)(1)(A), Uretek has been and will be further damaged, and EagleLIFT has been and will be unjustly enriched, in an amount subject to proof at trial.

### COUNT 2: IMPROPER USE OF URETEK TRADEMARKS (15 U.S.C. § 1125(a)(1)(B))

139. Uretek incorporates by reference all previous factual statements and allegations.

140. EagleLIFT violated 15 U.S.C. § 1125(a)(1)(B) (section 43 of the Lanham Act) by using the Uretek Trademarks without Uretek's consent in connection with services, including Polyurethane Injection Services, in commerce, including on its website and on Facebook.

141. Upon information and belief, EagleLIFT continues to violate 15 U.S.C. § 1125(a)(1)(B) (section 43 of the Lanham Act) by continuing to use the Uretek Trademarks without Uretek's consent in connection with services, including Polyurethane Injection Services, in commerce, including on its website and on Facebook.

142. EagleLIFT's prior and continuing use of the Uretek Trademarks in commercial advertising or promotion, misrepresents the nature, characteristic, quantities, and/or geographic origin of EagleLIFT's and Uretek's services and commercial activities.

143. As a proximate result of EagleLIFT's violations of § 1125(a)(1)(B), Uretek has been and will be further damaged, and EagleLIFT has been and will be unjustly enriched, in an amount subject to proof at trial.

### COUNT 3: FALSE OR MISLEADING DESCRIPTION OF FACT, FALSE OR MISLEADING REPRESENTATION OF FACT (15 U.S.C. § 1125(a)(1)(A))

144.    Uretek incorporates by reference all previous factual statements and allegations.

145.    EagleLIFT violated 15 U.S.C. § 1125(a)(1)(A) (section 43 of the Lanham Act) by making false or misleading descriptions of fact or false or misleading representations of fact in connection with services, including Polyurethane Injection Services, in commerce, including on its website, including at least the following conduct:

   a)   stating on its website that it is the "sole licensee in Arizona, California, and Nevada" of Uretek and of the "URETEK Polymer Injection Process," when it is not;

   b)   advertising on its website that it has 15-20 years of experience performing Polyurethane Injection Services for government entities, even though Uretek rarely allowed EagleLIFT to perform such services under the Distributorship Agreement;

   c)   holding itself out as having performed a $2 million project for the California Department of Transportation in the San Francisco Bay area in 2017 that was actually completed by Uretek;

   d)   stating on its website that it has helped innovate the Polyurethane Injection Services when it did not; and

   e)   holding itself out as having developed the 2-part polymers that are used in Uretek's Polymer Injection Services, when it did not.

146.    Upon information and belief, EagleLIFT continues to violate 15 U.S.C. § 1125(a)(1)(A) (section 43 of the Lanham Act) by continuing to make false or misleading descriptions of fact or false or misleading representations of fact in connection with services, including Polyurethane Injection Services, in commerce, including on its website, including the above conduct.

147.    EagleLIFT's false or misleading descriptions of fact or false or misleading representations of fact have or are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of EagleLIFT with Uretek, or as to the origin, sponsorship, or approval of EagleLIFT's services, or commercial activities by Uretek.

148.    As a proximate result of EagleLIFT's violations of 15 U.S.C. § 1125(a)(1)(A), Uretek has been and will be further damaged, and EagleLIFT has been and will be unjustly enriched, in an amount subject to proof at trial.

### COUNT 4: FALSE OR MISLEADING DESCRIPTION OF FACT, FALSE OR MISLEADING REPRESENTATION OF FACT (15 U.S.C. § 1125(a)(1)(B))

149.    Uretek incorporates by reference all previous factual statements and allegations.

150.    EagleLIFT violated 15 U.S.C. § 1125(a)(1)(B) (section 43 of the Lanham Act) by making false or misleading descriptions of fact or false or misleading representations of fact in connection with services, including Polyurethane Injection Services, in commerce, including on its website, including at least the following conduct:

   a)   stating on its website that it is the "sole licensee in Arizona, California, and Nevada" of Uretek and of the "URETEK Polymer Injection Process," when it is not;

   b)   advertising on its website that it has 15-20 years of experience performing Polyurethane Injection Services for government entities, even though Uretek rarely allowed EagleLIFT to perform such services under the Distributorship Agreement;

   c)   holding itself out as having performed a $2 million project for the California Department of Transportation in the San Francisco Bay area in 2017 that was actually completed by Uretek;

   d)   stating on its website that it has helped innovate the Polyurethane Injection Services when it did not; and

   e)   holding itself out as having developed the 2-part polymers that are used in Uretek's Polymer Injection Services, when it did not.

151.    Upon information and belief, EagleLIFT continues to violate 15 U.S.C. § 1125(a)(1)(B) (section 43 of the Lanham Act) by continuing to make false or misleading descriptions of fact or false or misleading representations of fact in connection with services, including Polyurethane Injection Services, in commerce, including on its website, including the above conduct.

152.    EagleLIFT's false or misleading descriptions of fact or false or misleading representations of fact in commercial advertising or promotion, misrepresents the nature, characteristic, quantities, and/or geographic origin of EagleLIFT's and Uretek's services and commercial activities.

153.    As a proximate result of EagleLIFT's violations of 15 U.S.C. § 1125(a)(1)(B), Uretek has been and will be further damaged, and EagleLIFT has been and will be unjustly enriched, in an amount subject to proof at trial.

**FOURTH CLAIM FOR RELIEF: Misappropriation Under Texas Law**

154.    Uretek incorporates by reference all previous factual statements and allegations.

155.    Uretek developed the Polyurethane Injection Services through extensive time, labor, skill and money.

156.    Uretek provided EagleLIFT extensive training, expertise, know-how, trade secrets, confidential information, marketing materials, and trademark and license rights related to the Polyurethane Injection Services, including the URETEK PROCESSES, upon the condition that EagleLIFT not perform conflicting service, including performing the URETEK PROCESSES or using Uretek's confidential information or trade secrets, in competition with Uretek, for four years after termination of the Sales Representative Agreement and Distributorship Agreement.

157.    EagleLIFT now markets and offers for sale the Polyurethane Injection Services, including the URETEK PROCESSES, and uses Uretek's confidential information and trade secrets to provide services to Uretek customers and potential customers. As a result, EagleLIFT's misappropriation allows EagleLIFT to reap the benefit of Uretek's development efforts without being accountable as to the burden and expense of those efforts and thus to gain a special advantage in competition for EagleLIFT.

158.    Uretek has suffered commercial damage as a result of EagleLIFT's misappropriation.

## SUPPORT FOR PERMANENT INJUNCTION

159.    Uretek incorporates by reference all previous factual statements and allegations.

160.    Immediate and irreparable harm will result from EagleLIFT's continued competition with Uretek in the United States, its use of Uretek's confidential information and trade secrets to compete with Uretek in the United States, EagleLIFT's continued use of the Uretek Works, EagleLIFT's continued infringement of Uretek Trademarks,  EagleLIFT's continued false advertising, and EagleLIFT's continued misappropriation of the URETEK PROCESSES.

161.    Because Uretek's remedy at law is inadequate, Uretek seeks preliminary and permanent injunctive relief.  Uretek is threatened with losing its current and future business opportunities, its competitive advantage, and its goodwill, in amounts which may be impossible to determine, unless EagleLIFT is enjoined and restrained by order of the Court.

162.    EagleLIFT has agreed by contract that Uretek's remedy at law is inadequate and that it is entitled as a matter of right to an injunction for breach of the non-competition provisions of the Sales Representative Agreement and the Distributorship Agreement.

163.    Public policy supports granting preliminary and permanent injunctive relief to prevent further trademark infringement, misappropriation, and breach of contract.

## JURY DEMAND

164.    Uretek demands a jury trial in this matter.

## **PRAYER FOR RELIEF**

Uretek requests:

a)  a preliminary and permanent injunction prohibiting EagleLIFT from performing conflicting service (as defined in the Sales Representative Agreement and Distributorship Agreement) for two years after termination of the Sales Representative Agreement and Distributorship Agreement in Arizona, Nevada, and any state outside EagleLIFT's territory (as defined in the Sales Representative Agreement and Distributorship Agreement);

b)  a preliminary and permanent injunction prohibiting EagleLIFT from performing conflicting service (as defined in the Sales Representative Agreement and Distributorship Agreement) using any of Uretek's confidential information or trade secrets for two years after termination of the Sales Representative Agreement and Distributorship Agreement in the United States;

c)  equitable tolling of the term of any injunction prohibiting EagleLIFT from performing conflicting service to account for any such conflicting service performed before imposition of the injunction;

d)  a preliminary and permanent injunction requiring EagleLIFT to permanently delete all Uretek Works in its possession, custody, or control, and prohibiting EagleLIFT from any further use of any Uretek Works;

e)  a preliminary and permanent injunction prohibiting EagleLIFT from using any of the Uretek Trademarks in commerce;

f)  a preliminary and permanent injunction prohibiting EagleLIFT from making false or misleading descriptions of fact or false or misleading representations of fact in connection with services, including Polyurethane Injection Services, in commerce;

g)  a preliminary and permanent injunction prohibiting EagleLIFT from performing the Polyurethane Injection Services, including the URETEK PROCESSES, in the United States using any knowledge, skill, or information misappropriated from Uretek;

h)  liquidated damages pursuant to Article 8.H of the Distributorship Agreement;

i)  actual damages, including pursuant to 15 U.S.C. § 1117(a);

j)  treble damages pursuant to 15 U.S.C. § 1117(b);

k)  statutory damages pursuant to 15 U.S.C. § 1117(c);

l)  EagleLIFT's profits pursuant to 15 U.S.C. § 1117(a);

m)  punitive damages;

n)  attorney fees pursuant to 15 U.S.C. § 1117(a) and Texas Civil Practice and Remedies Code § 38.001(8);

o)  pre-judgment and post-judgment interest;

p)  all costs of suit, including pursuant to 15 U.S.C. § 1117(a); and

q)  such other and further relief as the Court may deem just and proper.

Dated: November 21, 2018    Respectfully submitted,

        By /s/ *Charles B. Walker, Jr.*
        Charles B. Walker, Jr.
        *Attorney-in-Charge*
        Texas Bar No. 00794808
        S.D. Tex. Bar No. 19307
        NORTON ROSE FULBRIGHT US LLP
        Fulbright Tower
        1301 McKinney, Suite 5100
        Houston, Texas 77010-3095
        Tel: (713) 651-5151
        Fax: (713) 651-5246
        charles.walker@nortonrosefulbright.com

OF COUNSEL:

Jeffrey P. Kitchen
S.D. Tex. Bar No. 2574035
jeff.kitchen@nortonrosefulbright.com
Andrea Shannon
andrea.shannon@nortonrosefulbright.com
S.D. Tex. Bar. No. 3265148
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010
Tel: (713) 651-5151
Fax: (713) 651-5246